**Darrell JACKSON, Plaintiff–Appellant,**

**v.**

**Warden Burl CAIN, et al., Defendants–Appellees.**

**No. 87–3110.**

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1989.

---

Prof. Thomas H. Sponsler, New Orleans, La. (court-appointed), for plaintiff-appellant.

Houston T. Penn, J. Marvin Montgomery, Adair D. Jones, Robert W. Sawyer, Asst. Attys. Gen., Baton Rouge, La., for defendants-appellees.

Before WILLIAMS and GARWOOD, Circuit Judges, and NOWLIN *, District Judge.

JERRE S. WILLIAMS, Circuit Judge:

Darrell Jackson appeals from the district court's grant of summary judgment for the defendants' and the subsequent dismissal of his civil rights suit against various prison officials and employees of the Louisiana Department of Corrections (DOC). On appeal, Jackson raises various procedural challenges to the judgment and also challenges the district court's granting of summary judgment on all of his substantive claims.

### Factual Background

Darrell Jackson, formerly an inmate in the Louisiana state prison system, filed this *pro se* lawsuit under 42 U.S.C. § 1983 on April 4, 1986. Jackson alleged violations of his constitutional and civil rights by defendants, Warden Burl Cain of the Dixon Correctional Center, Donald McNeil, Terry W. Thompson, Terry Jenkins, Dr. Kay Kovacs, Gwen Coleman,[1] and Richard Stalder, current or former prison officials and employees of the Louisiana Department of Corrections.

The facts in this lawsuit are somewhat convoluted but largely undisputed. Because we are reviewing a summary judgment motion we accept Jackson's allegations as true for purposes of this review. On April 15, 1985, Jackson was transferred from Camp Beauregard, Work Training Facility/North (hereafter "Beauregard"), to the Dixon Correctional Institute (hereafter "Dixon") to work on a volunteer detail at the Louisiana State Capitol in Baton Rouge. On entering Dixon, Jackson claims he was informed that his personal clothes which he was permitted to wear at Beauregard, but not at Dixon, would be mailed to an address of his choice at state expense.

On May 14, 1985, Jackson was informed that if he did not pay $2.79 to mail his clothing it would be destroyed. As he was so informed only one day before the deadline, he was understandably anxious to ship off his clothes expediently. He filled out the appropriate form, wrote "send immediately" on it and submitted the $2.79 at once. On a place on the form entitled "witnessed by:" he wrote "I feel that I am sound enough essentially to witness for myself as to what belongs to me and what doesn't." Jackson also wrote to the warden complaining that some of the clothing

---

\* District Judge of the Western District of Texas, sitting by designation.

1. Gwen Coleman is no longer an employee of the Louisiana D.O.C., was never served, and is thus no longer a defendant.

that had been taken from him when he entered Dixon was not listed on the form.

On the next day, May 15, 1985, Jackson was taken from his duties at the Capitol in handcuffs, leg irons, and a waist chain that was attached to his handcuffs. He was escorted by a total of eight security officers: two state troopers, four security officers from the Department of Corrections, and two from the State Capitol. Jackson alleges that the handcuffs were fitted very tightly and injured his left wrist permanently.

Jackson was taken back to Dixon to the office of Col. Donald McNeil. There, McNeil and Terry W. Thompson berated him for his comment on the mail room form and for writing "a nasty letter" to Warden Burl Cain. Jackson explained his concern about the postal regulations and the need to mail his personal possessions quickly lest they be destroyed. Thompson, however, said that Jackson needed some "punishment" to teach him about Dixon and suggested sending him to work "in the field." McNeil rejected this plan, however, proposing the alternative of putting Jackson on Terry Jenkins' crew instead.

The Jenkins' crew worked in a feed lot. Jackson alleges that over the next 47 days he was required to work in a barn shoveling unshucked corn that was over a year old and contaminated with rats' nests, insects, and clods of white, sandy dust. He had to work unmasked while covered with corn dust in addition to pushing an iron wagon full of corn approximately 80 feet ten times a day throughout the 47 day period. His nose bled, his hair fell out, and his face broke out in sores. He was also required to mow grass for two hours a day with a sub-standard push lawn mower. He claims he was the only member of the crew required to do the mowing. After roughly a month of this treatment Jackson claims Terry Thompson told him on June 20th that if he would stop writing letters to Col. Donald McNeil they would rescind this punishment.

A week later, on June 28, Jackson was taken to the prison infirmary and told by appellee Coleman that blood tests had revealed that he suffered from syphilis. Jackson protested that the diagnosis was a mistake and requested another blood test to confirm it. His request was denied, and he was threatened with "lock-down" treatment if he refused medication.

On July 2, 1985, he was returned to the Capitol detail. When assigned to the Capitol, Jackson was housed at a satellite facility away from Dixon. Jackson was returned to Dixon on July 10. He claims that he was returned under the pretext that he refused to take the antibiotics prescribed for his disease. He alleges that in fact the medical department failed to forward his medication to the satellite facility. Jackson was then put back on Terry Jenkins crew for a second time. He claims his assignment was a direct result of the erroneous reports of Coleman and Kovacs that he had refused to take his medicine. During Jackson's second assignment to Jenkins' crew the difficulty of his work increased.[2] Jackson maintains the increased difficulty was a result of his refusal to stop "writ writing." He claims that he was again required to work with contaminated corn and was also put to work smashing concrete blocks with an 85 pound hammer in the summer heat.

Jackson was assigned this work while he was being treated with antibiotics for syphilis, even though such exposure to sunlight and heat is directly contrary to the treatment for the disease (as stated by the charity hospital which diagnosed Jackson over a year after the initial diagnosis in the prison). Jackson lost various privileges in his prison status as a result of the poor disciplinary record accrued from these incidents. Further, he claims to suffer still from physical ailments caused by this treatment.

---

**2.** It is unclear how long Jackson was on the Jenkins' crew during his second sojourn there. In his original complaint he alleged 106 days of hard labor—whether this was the total combined time on the crew between the two assignments, or the length of the second one is unclear.

In their brief on appeal, appellee's claim that "the essential facts necessary to resolve this case are undisputed." A review of Jackson's original complaint, motion for summary judgment, the attached Administrative Remedy Procedure (ARP) file, and his appellate briefs reveals two potential factual disputes: (1) Jackson claims he was promised he would retain all the various privileges he had at Camp Beauregard when he was transferred to Dixon. Officials at Beauregard claim he was merely told that if he did a "good job" at Dixon they would not oppose his return. (2) The motive of the prison officials' in transferring Jackson from the Capitol crew to Jenkins' crew is contested. Prison officials stated on one ARP form that Jackson "had some disciplinary problems" on the Capitol crew; in a later ARP form they stated that his "performance on the Capitol crew was less than adequate." In their appellate briefs they state that when Jackson was asked for a mailing address "a dispute arose." However, in their motion for summary judgment the defendants claimed that Jackson's privileges were suspended "because of his unsatisfactory performance on the Capitol crew." Jackson's story has been more consistent—he has claimed all along that he was removed the first time in retaliation for writing the warden, and the second time because of spurious claims that he refused to take his medicine.

### Procedural Background

Jackson filed this lawsuit on April 4, 1986, and sought "$.5 million" in punitive damages, a physical examination to determine damage to his body, and a full pardon from confinement.

On April 11, 1986, the district court stayed the proceeding for ninety days to allow Jackson to exhaust his administrative remedies. On July 21, the district court reinstated the case and ordered "that within sixty (60) days of the date of this order, the parties shall file cross motions for summary judgment based on the record of the administrative procedure." The district court then referred the case to a magistrate who was ordered to determine whether or not a plenary hearing was required, and if not, to submit findings of fact and conclusions of law in support of his recommendation to the district court. After some procedural delays, both parties did file summary judgment motions.

After the hearing, the magistrate found that: (1) Jackson's claim regarding removal from the Capitol grounds in shackles and handcuffs raised no federal issue. (2) Jackson's complaint about his job reassignment did not raise a claim under federal law. (3) Jackson's allegations of permanent injury were unsubstantiated. (4) Jackson was not denied medical care. Forcing him to undergo treatment for syphilis and denying him an additional blood test did not violate his constitutional rights. (5) There was no evidence that prison officials had tampered with Jackson's mail. Based on these findings and conclusions, the magistrate recommended that Jackson's summary judgment motion be denied and that the defendants' motion for summary judgment be granted. Jackson filed a written objection to the report in which he reiterated his original complaint, contested all the magistrate's findings and restated an earlier assertion that he had not consented to have his case heard by a magistrate.

The district court approved the magistrate's recommendation, granted the appellees' motion for summary judgment and dismissed Jackson's suit. Jackson filed a notice of appeal on February 9, 1987, which we initially found untimely and dismissed. We reinstated the appeal upon discovering that Jackson had sent his notice of appeal on time to the district court, which then sent it to this Court but out of time. On March 21, 1988, we appointed counsel to represent Jackson for purposes of this appeal. Jackson's attorney submitted a supplemental brief on May 20, 1987. The appellees did not submit an additional brief in response to Jackson's supplemental brief.

Jackson has asked this Court to reverse the district court's grant of a summary judgment for the appellees and dismissal of the appellant's suit. He further requests that this Court remand his suit to the district court for additional discovery and trial. He challenges the summary judgment

finding both on grounds of procedural error and because there were questions of material fact regarding his substantive claims.

## I. *Standard of Review*

To determine whether summary judgment has been properly granted, an appellate court must review the record employing the same standards which the trial court applied. *Wilson v. United States Fidelity & Guaranty Insurance Co.*, 830 F.2d 588, 590 (5th Cir.1987) (citing *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir.1986)). Hence, we must determine whether "there is no genuine issue as to any material fact" and that the defendants are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985). We therefore draw all reasonable inferences most favorable to the party opposing the motion. *Phillip's Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). However, "[o]nly disputes over facts that might affect the outcome of this suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Summary judgment, although a useful device, must be employed cautiously because it is a final adjudication on the merits. *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir.1986). In *Murrell v. Bennett*, 615 F.2d 306 (5th Cir.1980), another prisoner *pro se* case, we held that "Because its [summary judgment] consequences are so severe, however, we must always guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." *Id.* at 311.

The defendants moved for summary judgment on the ground that the plaintiff "failed to state a federal claim under which relief could be granted." This motion, therefore, also encompassed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The defendants relied on the plaintiff's allega-

tions of fact as found in his complaint and the results of the previous administrative proceedings.

In evaluating a motion which challenges the adequacy of a complaint under 12(b)(6) in a prisoner's *pro se* suit, this Circuit has found that the trial court must look beyond the inmate's formal complaint and consider material subsequently filed as amendments to that complaint. *Howard v. King*, 707 F.2d 215, 220 (5th Cir.1983). Furthermore, we have held

> [I]t is the responsibility of the courts to be sensitive to possible abuses [in the prison systems] in order to ensure that prisoner complaints, particularly *pro se* complaints, are not dismissed prematurely, however unlikely the set of facts postulated. An opportunity should be provided the prisoner to develop his case at least to the point where any merit it contains is brought to light.... *Pro se* prisoner complaints must be read in a liberal fashion and should not be dismissed unless it appears beyond all doubt that the prisoner could prove no set of facts under which he would be entitled to relief.

*Taylor v. Gibson*, 529 F.2d 709, 713–14 (5th Cir.1976); *see also Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). We therefore utilize the 12(b)(6) standard allowing consideration of subsequent materials as set out in *Howard v. King* in reviewing the dismissal of this prisoner's *pro se* complaint.

## II. *Procedural Claims*

■ Jackson first contends that the district court erred by denying him a copy of his medical records. Fed.R.Civ.P. 34 requires that a request for production of documents be served on the party from whom the documents are requested. The record contains Jackson's requests but fails to indicate that the request was ever served on the defendants. Moreover, Jackson failed to move to compel the production of the requested documents under rule 34(b) and rule 37(a). Therefore, Jackson's argument is without merit.

■ Jackson next asserts, on appeal, that the district court erred by denying him a trial before a jury. This assertion seems to be a continuation of his earlier objections to having a magistrate hear the case. Jackson's argument is without merit. The consent of the parties is required where a magistrate is appointed to conduct proceedings and enter judgment. 28 U.S.C. § 636(c)(1) and (2) (1982). No such consent is required, however, where the district court merely refers a prisoner's petition challenging conditions of confinement to a magistrate for a determination of whether to hold a hearing and to make findings and recommendations.

A judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

28 U.S.C. § 636(b)(1)(B) (1982).

*See also Archie v. Christian*, 808 F.2d 1132, 1135 (5th Cir.1987); *Ford v. Estelle*, 740 F.2d 374, 376–77 (5th Cir.1984). In this case the ultimate decision-making authority was retained by the district court. *See Ford*, 740 F.2d at 379. Moreover, referral to the magistrate did not deprive Jackson of a trial by a judge since the district court was free to accept, reject, or modify the magistrate's recommendation and since the district court entered the final judgment in the case.

■ Furthermore, Jackson waived his right to a trial by jury. Fed.R.Civ.P. 38(b) provides that a demand for a jury trial must be made within ten days of the service of the last pleading. In the instant case, the last pleading, the defendant's answer, was served on August 6, 1986. The first indication in the record that Jackson wanted a jury trial was in his motion to reconsider the show cause order, which was filed October 7—well after the ten day limit. Jackson, therefore, waived his right to a jury trial. *Lewis v. Thigpen*, 767 F.2d 252, 257 (5th Cir.1985). While the motion to reconsider stated that Jackson had previously asked the clerk to note his request for a jury trial, Jackson failed to say when that request was made and the record does not contain any earlier request for a jury trial. A party may be relieved of such a waiver upon motion and at the discretion of the trial court. Fed.R.Civ.P. 39(b); *Thigpen*, 767 F.2d at 257. Jackson, however, made no such motion, and therefore was not entitled to a jury trial.

■ Jackson also argues that the trial court erred in refusing to honor his motion for appointment of counsel. Generally speaking, no right to counsel exists in Section 1983 cases. "The trial court is not required to appoint counsel for an indigent plaintiff asserting a claim under 42 U.S.C. § 1983 unless the case presents exceptional circumstances." *Ulmer v. Chancellor*, 691 F.2d 209, 212 (5th Cir.1982). A district court has the discretion to appoint counsel if doing so would advance the proper administration of justice. 28 U.S.C. § 1915(d); *Ulmer*, 691 F.2d at 213. We cannot say that the district court's refusal to appoint counsel in the instant case amounted to an abuse of that discretion. In *Ulmer* we identified a number of factors which should be considered in ruling on a request for appointment of counsel. These included: (1) the type and complexity of the case; (2) whether the indigent was capable of presenting his case adequately; (3) whether the indigent was in a position to investigate the case; and (4) whether the evidence would consist in large part of conflicting testimony so as to require skill in the presentation of evidence and in cross examination. *Ulmer*, 691 F.2d at 213. The instant case is not particularly complex and Jackson proved capable of self-representation, at least until appellate proceedings. Moreover, Jackson failed to demonstrate that he was unable to secure private counsel.

■ Finally, Jackson complains that the trial court erred in staying his suit for ninety days for purposes of exhausting administrative remedy procedures. He

claims he had already exhausted such procedures prior to filing suit. It is true that he had already exhausted the three step administrative remedy procedure (hereafter "ARP") available to him in Dixon. On the 4th of January, 1986 he submitted his first ARP complaint. In it he complained of the alleged retaliation which caused him to lose his job at the State Capitol and he requested reinstatement of his privileges. He received a response to this which he considered unsatisfactory on the 13th of January 1986. He then went through the second and third steps of the ARP on the 16th of January and the 2nd of February, respectively. On the 14th of March, 1986, he received a response from the Secretary of Public Safety and Corrections which stated "your performance on the Capitol crew was less than adequate, resulting in your removal from it twice." The Secretary denied his requests, thus exhausting all potential administrative remedy procedures.

Although Jackson had exhausted all ARP steps, in his complaint of the 4th of April, 1986, he made no reference to that fact. 42 U.S.C. § 1997e(a)(1) provides that

> Subject to the provisions of paragraph (2), in any action brought pursuant to Section 1983 of this title by an adult convicted of a crime confined in any jail, prison, or other correctional facility, the court shall, if the court believes that such a requirement would be appropriate and in the interests of justice, continue such case for a period of not to exceed ninety days in order to require exhaustion of such plain, speedy, and effective administrative remedies as are available.

The court did not have any reason to know that Jackson's administrative remedies had already been exhausted; Jackson did not say in his complaint that he had already exhausted them. The court did not receive a record of the administrative remedy procedures and results until July 17, 1986. Thus the court was not in error in allowing a ninety day continuance for the exhaustion of remedies.

## III. *Substantive Claims*

In addition to Jackson's procedural claims, he also argues that the district court erred in granting summary judgment to the defendants on his substantive claims. Those claims include: (1) that he was hauled away from the Louisiana State Capitol in tightly fitting handcuffs which resulted in permanent injury to his left wrist; (2) that the prison officials tampered with his mail; (3) that he received inadequate medical treatment for his venereal disease; (4) that his treatment while working on the feed lot crew constituted cruel and unusual punishment; and (5) that his shift from a more desirable to a less desirable job was in retaliation for his exercise of constitutional rights, was punishment in excess of that permitted by prison rules, and his punishment did not comply with constitutional procedural requirements when the punishment was ordered. We will address each of these claims in order.

### A. *Use of Handcuffs*

■ In his motion for summary judgment Jackson claimed that he was "handcuffed, shackled and binded with a steel chain belt" and escorted from the Louisiana State Capitol by eight officers, inflicting "wanton pain" upon him. He later stated in his motion for summary judgment that he was "in pain because of the tightly applying (sic) of the handcuffs, shackles and waist chain." Jackson continues on appeal to make the bare allegation of permanent injury to his left wrist as a result of this shackling. The defendants have not specifically disputed these allegations.

In *Fulford v. King*, 692 F.2d 11, 14–15 (5th Cir.1982) we found the use of handcuffs or other restraining devices constituted a rational security measure and cannot be considered cruel and unusual punishment unless great discomfort is occasioned deliberately as punishment or mindlessly, with indifference to the prisoner's humanity. In *Fulford*, the evidence at trial demonstrated that less restrictive alternatives of ensuring security during trips outside the prison were available to the state. We concluded, however, that the Eighth Amendment does not require "that the state use the best means available for confining its prisoners." *Fulford*, 692 F.2d at

14 n. 7. It merely requires that the punishment not be "cruel and unusual." The use of shackles and handcuffs are restraints commonly used on inmates, even those of a preferred status.

Jackson alleges that his wrist was tightly bound and that this caused permanent injury. He also alleges that eight security officers transported him from the Capitol in a display of excessive force. These facts, however, do not rise to the level of cruel and unusual punishment. Jackson never alleges that great pain was caused deliberately by the officers or that this kind of handcuff was not customarily used on prisoners working outside the prison. There is nothing to show that Jackson was deliberately treated maliciously and differently from other trustees who might be transported from a work assignment due to unsatisfactory behavior. We uphold the trial court's summary judgment for defendants on this issue.

### B. *Mail Tampering*

■ Jackson claims his mail was tampered with. The documents from the administrative proceedings indicate that he complained that a letter regarding the administrative proceeding, not considered legal mail, had been taped closed. We have held that in order to prevent the sending of contraband, prison authorities may open a prisoner's mail for inspection. *Guajardo v. Estelle*, 580 F.2d 748, 759 (5th Cir.1978). Jackson has failed to allege that any problem with his mail denied him meaningful access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821–23, 97 S.Ct. 1491, 1494–96, 52 L.Ed.2d 72 (1977); *Jackson v. Procunier*, 789 F.2d 307, 311–12 (5th Cir. 1986). There is simply no allegation that any legal mail en route to or from an attorney or the court was tampered with or impermissibly handled. The district court was correct in finding the plaintiff's complaint of mail tampering without merit, and awarding summary judgment to the defendants.

### C. *Inadequate Medical Treatment*

Jackson's allegations regarding his contraction of syphilis and its treatment are somewhat confused. He initially objected to being compelled to take antibiotics, arguing that he was the victim of mistaken identity because it was another inmate, with a similar name, who had tested positive for syphilis. He denied that he had syphilis and requested a second blood test in order to prove that contention. However, he later admitted to having syphilis and to having tested positive for it in a free clinic in New Orleans. Jackson then complained that he somehow mysteriously got syphilis through his work on the feed lot crew, because he had been celibate for the past forty months of imprisonment. Jackson now argues that the defendants assigned him to hard labor, which was inconsistent with treating the disease after they knew he had syphilis. Finally, he claims that he was taken off the Capitol work crew the second time because the officials mistakenly thought that he was refusing to take his medication, when in fact his medication was not being forwarded to his dormitory.

■ Because Jackson's medical contentions are mutually contradictory, it is difficult to see what claim he has against the defendants. Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105–07, 97 S.Ct. 285, 291–93, 50 L.Ed.2d 251 (1976). There is no evidence that Jackson was denied medication or access to medical attention. Indeed, there is every indication the prison was prepared to force the prisoner to take the necessary antibiotics, which he was reluctant to do initially. Hence, Jackson's allegations regarding inadequacy of medical treatment cannot amount to a violation of federal rights. *See Estelle v. Gamble*, 429 U.S. at 107, 97 S.Ct. at 293–94; *Gardner v. Cato*, 841 F.2d 105, 106–07 (5th Cir.1988). The fact that Jackson's work assignment may have been inconsistent with or aggravated his disease is a different claim from his allegation of inadequate medical treatment, and we address it below. In the other respects, we

now uphold the district court's grant of summary judgment to the appellants on the claim of inadequate medical treatment.

## D. *Working Conditions*

Jackson complains that his work shoveling the unshucked corn was performed without a mask in spite of heavy corn dust and that these working conditions caused his nose to bleed, his hair to fall out and his face to break out in sores. He states that his work was more strenuous than other inmates', and that the heavy manual labor in the summer heat was inconsistent with treatment for his venereal disease. In his summary judgment motion he pointed out that when taken to a charity hospital in New Orleans syphilis was found and he was told that he had suffered from it for over a year. He was told to stay out of sunlight as much as possible and to work indoors. Yet when the syphilis was first diagnosed, over a year previously, Jackson was forced to perform labor directly contrary to these precautions. Jackson complains of permanent injury as a result, stating that he has difficulty breathing, chest pains, and a burning injury to his eyes.

## 1. Working conditions alone

The magistrate never addressed whether the working conditions per se violated the Eighth Amendment, although Jackson's complaint, construed liberally, claims they did. We have found, that in certain circumstances, prison work conditions may amount to cruel and unusual punishment. *See Howard v. King,* 707 F.2d 215, 219–20 (5th Cir.1983). In *Howard,* we wrote that in claiming that their 56 hour, 7 day work week in field labor caused perpetual exhaustion and physical breakdown, "the inmates have alleged physical and mental suffering which, if actually caused by the discipline to which they claim to have been subjected and to the extent that they allege, would entitle them to relief." *Id.* at 220.

This Court employs a "totality of conditions test" for analyzing Eighth Amendment claims. *Howard,* 707 F.2d at 219; *Ruiz v. Estelle,* 679 F.2d 1115, 1139 (5th

Cir.) *amended in part and vacated in part, on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). An individual judge must avoid employing a subjective view of what is cruel and unusual punishment. Instead, objective factors should be utilized to the maximum possible extent. *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); *Ruiz,* 679 F.2d at 1138. The Supreme Court has cautioned against finding Eighth Amendment violations too readily, because once a given condition is found to violate it, it cannot be reviewed "in the light of further experience" short of reversal or a constitutional amendment. *Rhodes,* 452 U.S. at 351, 101 S.Ct. at 2401.

There is no indication here that Jackson was not afforded sufficient rest (unlike the prisoners in *Howard*) or that he was required to perform labors beyond the ordinary prisoner's strength (although he does allege, but without material details, that he was made to do more and harder work than other members of the crew). Working in heavy corn dust without a mask could conceivably have been work so deleterious to health that the totality of circumstances violates contemporary standards of decency, the standard outlined in *Rhodes.* *Rhodes,* 452 U.S. at 346–47, 101 S.Ct. at 2399. We have held, however, that in the absence of a clearly established law, prison officials cannot be held to a higher standard of care than the surrounding community when providing for the safety of prisoners. *Sampson v. King,* 693 F.2d 566, 569 (5th Cir.1982). In *Sampson,* a prisoner complained of being forced to work in fields recently sprayed with a pesticide, Parathion. We held this allegation did not rise to an Eighth Amendment violation because there was no showing that the practice differed from that of the surrounding agricultural community or violated a clearly established law.

The only factor which distinguishes the working conditions complained of here from those in *Sampson* are the alleged agent of harm—corn dust instead of Parathion. Of critical importance is the fact

that Jackson was part of a regular work crew, and his claim of harsher treatment than other members of the crew is a bare allegation without any factual support. Although the injuries of which Jackson complains are more serious than Sampson's, the same ruling is appropriate to both cases. The working conditions, in and of themselves, did not violate the Eighth Amendment.

### 2. Working conditions aggravating disease

In addition to his contention that the working conditions were in themselves cruel and unusual, Jackson makes an alternative argument that the working conditions violated the Eighth Amendment because they were inappropriate to his medical condition. Among the cases we relied upon when deciding *Howard v. King, supra,* was *Ray v. Mabry,* 556 F.2d 881 (8th Cir. 1977). In *Ray* the Eighth Circuit noted that prison work requirements which compel inmates to perform physical labor which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment. *Id.* at 882. The prisoner in *Ray* objected to a 90 to 120 hour work week, in which he was compelled to do work unsuited to him because of a physical disability. The Eighth Circuit held that this stated a claim under the Eighth Amendment. It would appear, therefore, that the constitutionality of a particular working condition must be evaluated in the light of the particular medical conditions of the complaining prisoner.

> [W]hen the type of work to which the convict is assigned admittedly worsens a pathological condition, such work must be deemed cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution, when the work has been assigned with the knowledge of the condition and that it will be worsened thereby or when it has been continued with the same knowledge.

*Black v. Ciccone,* 324 F.Supp. 129, 133 (W.D.Mo.1970). At least this is so where the pathological condition is a medically

serious one, and the worsening is significant.

From the records it appears that Jackson was taken off the Jenkins' crew almost immediately after his syphilis was diagnosed. However, he was placed back on the same work detail a second time 8 days later for at least 59 more days. All of the second work assignment took place while Jackson was on an antibiotic treatment regime, after prison authorities assumed he had syphilis. But at the time he insisted the diagnosis was wholly mistaken. He now alleges that such heavy work in the sunlight was directly inconsistent with the treatment of syphilis. Medical treatment and working conditions overlap in this claim. Since the work was not cruel and unusual per se, only if the officials knew it would significantly aggravate Jackson's serious medical ailment would they have been acting in violation of the Eighth Amendment.

■ The prison officials' behavior would have to have risen above mere negligence. Mere negligence would not establish a claim. *Fielder v. Bosshard,* 590 F.2d 105, 107 (5th Cir.1979). *See also, Smith v. Dooley,* 591 F.Supp. 1157, 1169 (W.D.La. 1984) *aff'd without opinion,* 778 F.2d 788 (5th Cir.1985). While an "inadvertent failure" does not state a violation, deliberate indifference to a prisoner's serious medical needs does. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (the Eighth Amendment prohibits actions characterized by "obduracy and wantonness, not inadvertance or error in good faith."). *See also, Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 291; *Hearn v. Hudson,* 549 F.Supp. 949, 961–62 (W.D. Va.1982). If prison officials knowingly put Jackson on a work detail which they knew would significantly aggravate his serious physical ailment such a decision would constitute deliberate indifference to serious medical needs.

■ The magistrate in his analysis did not separate the issue of the appropriateness of working conditions to Jackson's physical condition from that of access to

medical care. However they are two separate claims. To quote the magistrate

> In addition to protesting the change in assignments, plaintiff complains about the conditions under which he shoveled corn and worked in a "sweatshop." Although the state generally has a responsibility to protect the safety of its prisoners, *Sampson v. King*, 693 F.2d 566 (5th Cir.1982), plaintiff's conclusions that he suffered permanent injuries performing his duties are totally unsubstantiated. Although plaintiff alleges he developed sores and was exposed to dust and rodents, he does not complain that he was denied any needed medical care.... Additionally, *there are no allegations that his condition warranted any special treatment or that he was required to perform duties not required of other inmates*. Plaintiff's pleadings and the administrative records reveal that plaintiff had access to medical treatment. (emphasis added)

The record belies this finding. In Jackson's motion for summary judgment and the briefs Jackson has submitted to this Court, he contends his illness required different work and that he notified the medical personnel that his work was injuring him. Jackson has specifically stated that being forced to do 106 days of hard labor in the sun is contrary to what he argues is standard procedure for treating venereal disease. In his summary judgment motion appellant contended that he was treated differently from other persons on the work crew, and was routinely forced to mow lawns for two hours in direct sunlight with a substandard push lawn mower, a task which no other inmates had to do. In his appeal to the Fifth Circuit Jackson further claims that "there were eight other inmates on the job with him, but they were called to do other jobs after it was always noticed that plaintiff was not resistant to the egregious conditions he suffered unconstitutionally." The contentions are inartfully phrased; they clearly state, however, that Jackson's condition warranted special treatment but that instead he was put on a sweatshop crew and at least part of his work differed from anyone else's.

The magistrate (and by implication, the district court) apparently thought that since Jackson's allegations of permanent injury from the work were unsubstantiated, his claim must fail. We have never imposed a permanent injury requirement on claims under the Eighth Amendment. In *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457 (5th Cir.1983), allegations of a cold, rainy, roach invested jail cell, with inoperative toilet facilities, stated a cause of action under the Eighth Amendment. Jackson did not provide the magistrate with medical records to substantiate his claim. He filed a request for production of his prison and medical records, but did not file a motion to compel production. It would be unduly harsh to dismiss a *pro se* prisoner's action because of this failure of legal knowledge. *See Murrell v. Bennett*, 615 F.2d 306, 310 (5th Cir.1980). Jackson has stated a valid claim under the Eighth Amendment. He should be given a chance to prove that (1) the work significantly aggravated his syphilis, causing him injury and (2) the prison officials knew of this specific danger because of his physical condition and yet ignored it. Summary judgment was inappropriate as to this part of the action.

### E. *Substantive and Procedural Due Process Claims*

Jackson claims that he was moved from a desirable job assignment to a "punishment crew" because he wrote an arguably offensive remark on the clothes release form and also a letter to the prison warden. Once on the Jenkins' crew, Jackson alleges that he was told that he would be moved back to a more pleasant job assignment if he stopped his "writ writing". Both times Jackson was assigned to Jenkins' crew without a formal hearing.

The magistrate correctly pointed out that a prisoner has no constitutional right to a specific work assignment. Prison officials have broad administrative and discretionary authority over the institutions they manage, and lawfully incarcerated persons retain only a narrow range of protected liberty interests. *Hewitt v. Helms*, 459

U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Classification of inmates is one of those administrative functions. *Wilkerson v. Maggio,* 703 F.2d 909, 911 (5th Cir. 1983). There is no question that the prison officials had the general authority to reassign Jackson to new work. This general authority, however, can be exceeded.

Jackson claims that this general authority was exceeded and his constitutional rights violated in four ways, three substantive and one procedural: (1) Retaliation against him for exercise of his First Amendment right to freedom of expression. (2) Retaliation against him for exercising his state-created liberty interest by filing and pursuing grievances in the prison grievance system. (3) Punishing him in excess of prison-established limits for the punishment for his alleged offenses. (4) Failure to follow constitutional procedural due process requirements in punishing him. We address these four claims.[3]

### 1. First Amendment claims

■ A prison inmate is entitled to his First Amendment right to freedom of expression so long as it is not inconsistent with his status as a prisoner and does not adversely affect a legitimate state interest. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). The Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, ——, 107 S.Ct. 2254, 2261, 96 L.Ed. 2d 64 (1987). While we deal here with an action rather than a regulation, the same standard is applicable to determine if the prison authorities' response to Jackson's writing is constitutionally permitted.

Filling out a prison-mandated form and complaining about treatment by means of a private letter to the warden can be compatible with the acceptable behavior of a prisoner and thus may not adversely affect the discipline of the prison. Furthermore, in an analogous case, *Mount Healthy Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977) the Court held that an untenured school teacher who could be discharged under his hiring arrangement for any reason and who had no right to a hearing could nevertheless establish a claim to reinstatement if the decision not to rehire was made because of his exercise of protected First Amendment freedoms.

■ Jackson has raised an issue of material fact regarding the motives behind the prison authorities' decision to switch him from his Capitol detail job to a job on Jenkins' crew. He claims that it was done in retaliation for his exercise of First Amendment rights. The prison officials reply that his work detail was changed because his job performance was unsatisfactory. Because appellant has raised a fact issue as to whether the move was in retaliation, a constitutional issue arises. We must conclude that a summary judgment against Jackson was inappropriate.

### 2. The State-created liberty interest in use of prison grievance procedures.

■ Independent of his First Amendment claim, Jackson also asserts that there was retaliation because he used the established prison grievance procedure. We confronted a similar claim in *Williams v. Rhoden,* 629 F.2d 1099, 1103 (5th Cir.1980). In *Williams* the lower court had dismissed a prisoner's complaint of retaliation on the part of the Florida Probation and Parole Commission in denying him parole. The lower court based its dismissal on the ground that the possibility of obtaining parole is not a recognized entitlement protected by the due process laws. We agreed that state prisoners "do not necessarily have a federal right to due process in pa-

---

**3.** It is important to note that the prison officials could have transferred Jackson to any job for almost any reason or no reason at all, and he would have had no claim. But while this decision may be arbitrary, it may not be retaliatory against Jackson's exercise of constitutional rights, and while it may be in punishment, it may not be in excess of the prison's own guidelines or without minimal due process.

role release hearings." *Williams*, 629 F.2d at 1103. Our inquiry did not end there, however, as we wrote that:

> [E]ven assuming that Williams had no such right here and thus that the Florida parole commission members he named could have acted arbitrarily and capriciously in denying him parole and still escape possible liability under Section 1983 [citation omitted], parole commission members cannot escape possible Section 1983 liability for decisions to deny parole made in retaliation against or so as to hinder the exercise of federally protected rights.

*Id.* Similarly, we have recently held that a prisoner may raise the issue of retaliatory application of prison policies with respect to strip searches. *See Hay v. Waldron*, 834 F.2d 481, 487 (5th Cir.1987).

The Department of Corrections (hereafter, DOC) handbook [4] provides that inmates seeking to use formal procedures to resolve concerns must make a request to the warden in writing within thirty days after an incident. The handbook also provides that no reprisal action shall be taken against anyone for good faith use of this procedure.[5] Jackson's allegation is that the use of the grievance procedure is a liberty interest under the due process clause, as established by prison rules. He then claims retaliation against his exercise of that liberty interest. If such a liberty interest is indeed established by prison regulations, then retaliation against a prisoner for the exercise of it creates a valid claim under 42 U.S.C. § 1983.

The administrative proceedings and the summary judgment motion of the appellees reveal that they claimed Jackson was removed because he did a poor job in the State Capitol detail. On further examination it may be determined that his complaint to the warden was not in good faith,

and hence the use of the grievance procedure was not justified. A facially valid claim, however, has been made. There is clearly a dispute of material fact. We must hold that summary judgment against Jackson on this claim of retaliation for use of the grievance procedure was in error.

3. Punishment in excess of limits established by the prison rules

Jackson urges that by establishing nondiscretionary standards and criteria for decisions regarding the amount and kind of punishment, the state created a protected liberty interest under the due process clause of the Fourteenth Amendment. Under this contention, even assuming Jackson's letter to the warden was an offense in violation of the rules, he urges that the punishment given him was in violation of the limitations established in the handbook which apply to his offense. We evaluate this claim.

■ It has been emphasized by the Supreme Court that day-to-day operation of prisons must be left to the broad discretion of prison officials. "[R]egulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to 'liberty,' different from statutes and regulations in other areas." *Hewitt v. Helms*, 459 U.S. 460, 470, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). Thus in the case of prisoners:

> [a]s long as the conditions or degree of confinement to which a prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

*Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).

---

4. The Louisiana Department of Public Safety and Corrections has adopted a set of disciplinary rules and procedures for adult prisoners in the DOC handbook, by authority of the Louisiana Legislature, La.Rev.Stat.Ann. §§ 15:1171 —:1177 (West Supp.1989), and with the approval of the United States District Court for the Middle District of Louisiana.

5. It should be noted that Jackson does not rely here on the fact that prison officials violated the DOC handbook's rule against retaliation. Rather, his claim is that retaliation for proper, good faith use of a state-established liberty interest (the prison grievance system) is a *prima facie* violation of substantive due process.

For instance, a transfer from a preferable to an inferior prison does not in itself state a substantive due process claim, because in the absence of an appropriate state regulation a prisoner has no liberty interest in residence in one prison or another. "That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Similarly, a prisoner has no protected liberty or property interest *per se* in avoiding transfer from a desirable to an onerous job in the prison system.

No constitutional right exists to prevent the transfer of an inmate to a mental hospital (*Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980)) or denial of release on parole (*Greenholtz v. Inmates of Nebraska Penal Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979)) or denial of good time credits, (*Wolff v. McDonnell*, 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)). But once the state creates such a liberty interest, due process protections attach to the decision to revoke the interest.

The Supreme Court has held that a state can create a protected liberty interest by establishing sufficiently mandatory discretion-limiting standards or criteria to guide state decision makers. *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms*, 459 U.S. at 470–71, 103 S.Ct. at 871; *Vitek v. Jones*, 445 U.S. at 488–89, 100 S.Ct. at 1261; *Green v. McKaskle*, 788 F.2d 1116, 1125 (5th Cir.1986); *Lewis v. Thigpen*, 767 F.2d 252, 261–62 (5th Cir.1985); *Parker v. Cook*, 642 F.2d 865, 867, 876 (5th Cir. Unit B, April 1981). Jackson claims that the State of Louisiana created such a liberty interest when it promulgated the DOC

handbook. Because the handbook provides a specific schedule of offenses and punishments, Jackson claims he had a legitimate expectation that any transgressions on his part would not be met by more than the maximum applicable punishment outlined in the regulations.

This contention is supported by the Supreme Court's decision in *Vitek v. Jones, supra:*

> If the state grants a prisoner a right or expectation that adverse action will not be taken against him except on the occurrence of specific behavior, "the determination of whether such behavior has occurred becomes critical, and the minimal requirements of procedural due process appropriate for the circumstances must be observed."

445 U.S. at 490–91, 100 S.Ct. at 1262. *See Hewitt v. Helms*, 459 U.S. at 470–71, 103 S.Ct. at 871; *Dzana v. Foti*, 829 F.2d 558, 560 (5th Cir.1987).

Thus, this Court has held that a prisoner challenging his change in classification and transfer to administrative segregation stated a due process claim if he could show that Texas Department of Corrections regulations "authorized his transfer to administrative segregation only for specified reasons" and the reason he was transferred was not one so specified. *Green v. McKaskle*, 788 F.2d at 1125.[6]

■ In inquiring whether Jackson can possibly show such a liberty interest we stress two considerations: First, the sole standard for a state-created liberty interest claim is that "[a]n inmate must show 'that particularized standards or criteria guide the State's decisionmakers.'" *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747 (quoting *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)), and that these criteria are sufficiently mandatory in nature. *Hewitt*,

---

**6.** In *Green* the prisoner contended he had a liberty interest in remaining in the general prison population instead of in administrative segregation. It has been recognized that a state can create such a liberty interest. *See Hewitt*, 459 U.S. at 469–71, 103 S.Ct. at 871–72. Jackson remained in the general prison population, al-

beit on a less pleasant job detail. He was never submitted to administrative segregation or "lockdown" treatment. As in the *Green* case, however, the state may have created a liberty interest by requiring that certain conduct not be met with more than specified punishment.

459 U.S. at 470–72, 103 S.Ct. at 870–71. Second, the prison decision must substantially affect the nature or length of a prisoner's confinement, for example affecting good time credits (*Wolff*, 418 U.S. at 556–57, 94 S.Ct. at 2975), parole (*Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2104), or transfer to a mental institution (*Vitek*, 445 U.S. at 488, 100 S.Ct. at 1261). However, in *Hewitt*, the Court also found a liberty interest in remaining in the general prison population as opposed to administrative segregation. Hence, *Hewitt* establishes there can be the requisite impact upon a prisoner's incarceration for that prisoner to have a liberty interest even though the terms of confinement are not modified radically in length or nature. *See also Lucas v. Hodges*, 730 F.2d 1493, 1503 *vacated as moot*, 738 F.2d 1392 (D.C.Cir.1984).

Jackson's case is somewhat analogous. While he remained in the general prison population, he went from trusty status to a medium level security position. Ultimately the series of incidents resulted, he alleges, in loss of good time credits. If Jackson's allegations are correct, his punishment ultimately might have seriously transformed the nature and length of his confinement.

■ We need not and do not now decide whether Jackson has proven such a substantive liberty interest; all we must determine is whether the plaintiff's complaints were sufficient to withstand a motion for summary judgment. *See Mitchell v. Hicks*, 614 F.2d 1016, 1019 (5th Cir.1980). Whether such a justified expectation creating a liberty interest actually existed must be determined by the trial court. *Lewis v. Thigpen*, 767 F.2d at 262; *Parker v. Cook*, 642 F.2d at 876. The overall impact of the actions taken against Jackson must be factually evaluated against the full background of prison procedures for placement, for denial of privileges, his work assignment, and other matters.

Accepting Jackson's allegations as to the events for purposes of reviewing the summary judgment, the only possible charge against Jackson for writing to the warden could have been disrespect, an offense defined in the DOC handbook as follows:

"Employees shall not be subject to unsolicited, non-threatening, abusive conversation, correspondence, or phone calls. Prisoners shall address employees by proper title or by "Mr.", "Ms.", "Miss", or "Mrs." whichever is appropriate. No prisoner shall curse an employee in his absence." Disrespect is a schedule A offense that permits punishment of extra duty for up to four days for each violation, quarters' change, job change (if the violation involves the job), or the loss of minor privileges for up to two weeks.

Jackson had been transferred temporarily from Camp Beauregard to work on a special trusty detail at the State Capitol. At the time he agreed to work this detail he claims that he was promised that he could keep his 20 cent per hour pay, honor dorm status, statewide trusty status, and quarterly furlough status. The prison officials dispute this claim. Accepting Jackson's allegations for summary judgment purposes, these significant privileges were taken from Jackson, although under the DOC handbook regime they could only have been suspended for a schedule B offense. Further, regardless of whether Jackson was promised he could keep his privileges or not, he was subjected to 47 days of supervised hard labor on Jenkins' squad—a significant job change and a penalty in excess of what is permitted for a schedule A offense. Finally, Jackson also claims he lost good time credits as a result of this incident. These allegations are sufficient to have withstood summary judgment since they raise substantial factual issues.

4. Procedural due process

■ Finally, Jackson alleges that he was deprived of his liberty interests without adequate procedural protections to comport with due process of law. Jackson seems to allege that a constitutional violation occurred because he was not accorded the level of process provided for in the DOC handbook. This argument must fail. A state's failure to follow its own procedural regulations does not establish a violation of due process, because "constitutional minima may nevertheless have been met."

*Brown v. Texas A & M University,* 804 F.2d 327, 335 (5th Cir.1986) (involving denial of a hearing to a University employee following his job loss). "There is not a violation of due process every time a university ... violates its own rules. Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation." *Levitt v. University of Texas at El Paso,* 759 F.2d 1224, 1230 (5th Cir.), *cert. denied sub nom. Levitt v. Monroe,* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed. 2d 578 (1985).

While Jackson has no federal right to insist that a state follow its own procedural rules, he does have a right to procedures which meet constitutional due process standards before he is deprived of a substantive liberty interest established under the state regulations. The Supreme Court has set out two standards in this area, depending on the sanction imposed upon the prisoner and consequences flowing from it. A prisoner punished by solitary confinement and loss of good-time credits must receive: (1) "written notice of the charges" against him at least twenty-four hours before the hearing, (2) a " 'written statement of the factfinders as to the evidence relied on and the reasons' for the disciplinary action" taken, and (3) the opportunity "to call witnesses and present documentary evidence in his defense," unless these procedures would create a security risk in the particular case. *Wolff,* 418 U.S. at 563–66, 94 S.Ct. at 2978–80. On the other hand, a mere few days administrative segregation, having no effect on parole, only merits an "informal nonadversary evidentiary review" as long as the prisoner receives notice and has an opportunity to present a statement. *Hewitt,* 459 U.S. at 476–77, 103 S.Ct. at 874. The Fifth Circuit reviewed these two standards and drew a clear dis-

tinction between them in *Dzana,* 829 F.2d at 561–62.

It would appear that the more stringent *Wolff* procedures are applicable as Jackson alleges a loss of good time credits resulted from this series of incidents. In any event in this case even the lesser *Hewitt* standard was violated. The appellant was taken before two persons, defendants McNeil and Thompson, without notice of the charges against him, and he was not given the opportunity to make a statement. In addition, the more stringent standard was not met because he was not provided with the opportunity to call witnesses on his own behalf and he was given no written summary of the evidence against him or reasons for the disciplinary action.[7]

In summary, there is a significant dispute concerning the reasons for Jackson's job transfer. If the transfer was in retaliation for Jackson's exercise of his free speech rights and his use of the grievance procedure, there was violation of Jackson's substantive rights. If the DOC created a substantive liberty interest in the expectation that a given offense would be met with only certain types of punishment and greater punishment was given, the officials may also have further violated substantive rights. Finally, they may also have violated procedural due process as well by giving Jackson a constitutionally inadequate hearing or no hearing at all. Subject to proof of his allegations, Jackson has stated valid Section 1983 claims. Summary judgment on the issues surrounding the decision to transfer Jackson from the Capitol detail to the punishment squad was in error because substantial questions of fact are unresolved.

### IV. *Conclusion*

We uphold the district court's summary judgment in favor of appellees against Jackson's claims involving the procedures of the district court. We also uphold the

---

7. Jackson was given a second work detail on the punishment squad. He asserts that the assignment resulted from a dispute concerning whether he had refused to take certain required medication. Jackson states that he had not refused to take it; it had never been sent to the facility

where he was housed when working on the Capitol detail. No hearing of any kind was held on this transfer. While this is a far lesser issue, it also is factually unresolved and must be part of the overall factual inquiry.

district court's ruling granting summary judgment on the issues of handcuffing, mail tampering, and medical treatment. We hold, however, that the district court was in error in following the magistrate's recommendation by granting summary judgment for appellees on the cruel and unusual punishment claim, the retaliation claims, the failure to follow punishment limitations, and procedural due process claims. We remand the case to the district court for discovery and trial as to those issues.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.