**Lance Michael TURNER, Petitioner,**

v.

**Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.**

Civil Action No. H–97–2590.

United States District Court,
S.D. Texas.

March 15, 1999.

658

Lance Michael Turner, Hughes Unit, Gatesville, TX, pro se.

Jeremy T. Hartman, Office of Attorney General, Austin, TX, James E. Custer, Office of Attorney General, Austin, TX, for respondent.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

### I. *Introduction*

Petitioner Lance Michael Turner ("Turner") challenges the outcome of three prison disciplinary hearings. Having reviewed the pending motion, the submissions of the parties, the state habeas record, the disciplinary records, and the applicable law, the court is of the opinion that Turner's Petition for Writ of Habeas Corpus (#1) should be denied and that Respondent Gary L. Johnson's ("Johnson") Motion for Summary Judgment (#16) should be granted.

### II. *Procedural History*

On March 27, 1984, Turner was convicted of burglary of a habitation, committed on November 21, 1983, and was sentenced to fifty years imprisonment. *See State v. Turner*, No. 84–90566–PQ (204th Dist.Ct., Dallas County, Tex., Mar. 27, 1984). While incarcerated, Turner pleaded guilty to committing aggravated assault on August 5, 1986. On March 24, 1987, upon his conviction of aggravated assault, the court affixed his punishment at a consecutive sentence of five years imprisonment. *See State v. Turner* (278th Dist.Ct., Madison County, Texas, Mar. 24, 1987).

In 1995, Turner was incarcerated at the Wynne Unit in Walker County, Texas. During a prison lock-down, Turner composed, typed, and distributed documents calling for a work stoppage by the inmates upon the cessation of the lock-down. According to Turner's petition, on March 23, 1995, he typed the documents on a word processing typewriter and printed 150 copies for distribution among the other inmates. Turner rolled each of 150 copies of the materials into cylindrical tubes and sealed them with tape. He then arranged for support service inmates to slide each of the tubes of documents into the cells of other prisoners.

According to the disciplinary records, in Disciplinary Case Number 950181472, a search of Turner's cell on March 25, 1995, revealed copies of certain of the work stoppage documents. His typewriter was confiscated after it was discovered that the contents of the documents in question were saved in its memory. When interviewed by prison staff, Turner admitted that he had prepared the work stoppage materials and had distributed approximately 150 copies to fellow inmates. At a disciplinary hearing on March 31, 1995, conducted by R.D. Boyd, Turner was found guilty of Disciplinary Offense 23, "Creating a Disturbance—any act or activity which results in a disruption of institution operations or breach of institution security." As a result, he forfeited 730 days of good conduct time credit, was restricted to his cell for fifteen days, lost commissary privileges for fifteen days, and was reduced in security classification from Line Class I to Line Class III. The reason given for the punishment selected was "engaged in specified behavior trying to instigate work stoppage."

The second incident, Disciplinary Case Number 950183344, occurred on March 31, 1995, when, during a routine search of the cells, a prison staff member found additional documents in Turner's cell advocating a work stoppage. At a disciplinary hearing conducted by J.A. Simpson on April 5, 1995, Simpson was again found guilty of Disciplinary Offense 23. The penalty imposed was the loss of 730 days of good conduct time credit and remaining in Line Class III for an indefinite period of time. The reason stated for the punishment assessed was "serious nature of offense/instituting a work stoppage on the Wynne Unit."

The third incident, Disciplinary Case Number 950200709, occurred on April 13, 1995, when, during a cell search, prison staff found seven pages of written and typed work stoppage documents in Turner's cell. At a disciplinary hearing on April 26, 1995, conducted by T.R. Carter, Turner was once again found guilty of Disciplinary Offense 23. As a consequence, he lost an additional 730 days of good conduct time credit and was to remain in Line Class III for an indeterminate period. The reason given for the punishment assessed was "Progressive Penalty—Lesser & previous penalty attempts have failed to achieve compliance with unit security/control concerns."

Turner filed a state application for a writ of habeas corpus challenging the three prison disciplinary proceedings, which the Texas Court of Criminal Appeals denied without written order on August 28, 1996. *See Ex parte Turner,* No. 20,084–03 (Tex.Crim.App. Aug. 28, 1996). Turner's appeals of his disciplinary cases through the prison grievance procedure were unavailing.

Turner filed his current federal petition for a writ of habeas corpus on July 30, 1997.

### III. *Claims*

Turner asserts the following claims in support of his petition for federal habeas corpus relief:

(i). he was denied due process of law because the three disciplinary proceedings were arbitrary and discriminatory;

(ii). he was subjected to double jeopardy when he was punished in three separate disciplinary proceedings for the same act;

(iii). he was deprived of a vested liberty interest under the Due Process Clause of the United States Constitution when his forfeited good conduct time credits were not restored;

(iv). the retroactive application of the policy preventing the restoration of lost good time credits violates the *Ex Post Facto* Clause of the Constitution;

(v). the application of a new prison policy extending the length of time between custody classification reviews improperly restricts his ability to earn good conduct time credits; and

(vi). the theft and destruction of his personal property interfered with his due process rights.

### IV. *Analysis*

#### A. *Prison Disciplinary Proceedings*

##### 1. *Due Process Claim*

■ Turner's claims must be analyzed in the context of the prison setting. Prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Wolff v. McDonnell,* 418 U.S. 539, 561, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Lawful imprisonment makes unavailable to an inmate many of the rights and privileges afforded an ordinary citizen due to the needs and exigencies of the institutional environment. *See id.* at 555, 94 S.Ct. 2963. Prisoners, however, may "claim the protections of the Due Process Clause." *Id.* at 556, 94 S.Ct. 2963. Nevertheless, "the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Id.* "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* (citing *Morrissey v. Brewer,* 408 U.S. 471, 488, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Instead, "there must be mutual accommodation between institutional needs and ob-

jectives and the provisions of the Constitution that are of general application." *Id.*

 ˝ Inmates, such as Turner, who are charged with an offense that could deprive them of good time credit are entitled to "those minimum procedures appropriate under the circumstances and required by the Due Process Clause" to insure that their rights are "not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. 2963; *Gibbs v. King*, 779 F.2d 1040, 1044 (5th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986). In the context of a prison disciplinary hearing, due process requires that the inmate be provided: (1) at least twenty-four-hour advance written notice of the disciplinary charges; (2) an opportunity to call witnesses and present documentary evidence when the presentation is not unduly hazardous to institutional safety or correctional goals; and (3) a written statement by the factfinder of the evidence relied upon and the reason for disciplinary action. *See Wolff*, 418 U.S. at 563–66, 94 S.Ct. 2963; *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir.1995); *Reeves v. Pettcox*, 19 F.3d 1060, 1062 n. 1 (5th Cir. 1994); *Smith v. Rabalais*, 659 F.2d 539, 543 (5th Cir.1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982). "Within these limits, the federal policy is to afford wide discretion to prison officials." *Gibbs*, 779 F.2d at 1044 (citing *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Moreover, if some of the procedural safeguards are overlooked, the petitioner must demonstrate resulting prejudice to establish a constitutional violation cognizable on federal habeas corpus review. *See Black v. Warren*, 134 F.3d 732, 734 (5th Cir.1998) (citing *Jackson v. Cain*, 864 F.2d 1235, 1251–52 (5th Cir.1989)); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir.), *cert. denied*, — U.S. ——, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997) (citing *Simpson v. Ortiz*, 995 F.2d 606, 609 (5th Cir.), *cert. denied*, 510 U.S. 983, 114 S.Ct.

486, 126 L.Ed.2d 436 (1993)); *Banuelos*, 41 F.3d at 234–35.

 When reviewing a prison disciplinary decision, "the standard to be applied is whether or not actions of the disciplinary committee were arbitrary and capricious or an abuse of discretion." *Smith*, 659 F.2d at 545 (citing *Thomas v. Estelle*, 603 F.2d 488, 490 (5th Cir.1979)). "The findings of a prison disciplinary hearing will not be disturbed unless they are arbitrary and capricious." *Banuelos*, 41 F.3d at 234. "[T]he requirements of due process are satisfied if some evidence supports the decision of the prison disciplinary board to revoke good time credits." *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The Supreme Court noted:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, and neither the amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence applies in this context.

*Id.* at 455–56, 105 S.Ct. 2768 (citations omitted); *accord Sweeney v. Parke*, 113 F.3d 716, 720 (7th Cir.1997); *Gibbs*, 779 F.2d at 1044. Stated differently, if there are "some facts" or "any evidence at all"

that supports the action taken by prison officials, the decision must be upheld on federal habeas review. *See Banuelos,* 41 F.3d at 234; *Gibbs,* 779 F.2d at 1044; *Smith,* 659 F.2d at 545; *see also Black,* 134 F.3d at 734; *Sweeney,* 113 F.3d at 720. As the Fifth Circuit observed:

> the federal courts cannot retry every prison disciplinary dispute; rather, the court may act only where arbitrary or capricious action is shown. This means that prison disciplinary proceedings will be overturned only where there is no evidence whatsoever to support the decision of the prison officials. A de novo factual review is not required.

*Reeves,* 19 F.3d at 1062 (citing *Smith,* 659 F.2d at 545); *accord Banuelos,* 41 F.3d at 234; *Stewart v. Thigpen,* 730 F.2d 1002, 1005–06 (5th Cir.1984).

■ A review of the disciplinary records reveals that Turner was notified of the charges against him on March 30, April 3, and April 20, 1995—one, two, and six days before the respective disciplinary hearings. In each case, a written statement was prepared delineating the evidence relied upon and the reasons for the disciplinary action taken. The report of the first hearing indicates that the hearing officer relied upon the testimony of the charging officer, D. Jansa, and copies of the documents advocating a work stoppage, which Turner admitted to preparing. At the second hearing, the hearing officer relied on the report of the charging officer, J. Simental, in which he described finding the inflammatory letters among Turner's possessions. At the third hearing, the hearing officer relied on Turner's admission of guilt and the report of the charging officer, H. Burson, in which he reported finding seven pages of written and typed material concerning demands for a work stoppage. In each case, Turner was allowed to confront and cross-examine the witnesses against him and was permitted to present his version of the events and any supporting evidence. While Turner indicates that he was dissatisfied with the testimony elic-

ited, he was not deprived of the right to call witnesses or present documentary evidence in his defense. Thus, Turner was afforded prior notice of the charges, an opportunity to call witnesses and present evidence, and a written statement by the factfinder of the evidence relied upon and the reason for disciplinary action, consistent with the requirements of due process in the prison context. *See Wolff,* 418 U.S. at 563–66, 94 S.Ct. 2963; *Banuelos,* 41 F.3d at 234; *Reeves,* 19 F.3d at 1062 n. 1; *Smith,* 659 F.2d at 543.

■ In addition, there is some evidence to support the findings of the hearing officers. The statements of the charging officers, Turner's own admissions, and copies of the work stoppage materials are more than adequate to sustain the conclusions of the hearing officers. Indeed, in his habeas petition, Turner admits that the letter calling for unity among prisoners is "inflammatory" and refers to the letter of unity and petition distributed to other prisoners as a "manifesto." The Supreme Court has recognized that "[t]he Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Hill,* 472 U.S. at 457, 105 S.Ct. 2768; *Black,* 134 F.3d at 734. "Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary hearing." *Hill,* 472 U.S. at 457, 105 S.Ct. 2768; *Black,* 134 F.3d at 734. In this instance, such findings are amply supported by the evidence.

Although Turner asserts that prison officials retaliated against him by pursuing the disciplinary charges, retaliation claims in the context of habeas corpus review of prison disciplinary hearings are approached with skepticism. *See Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir.1995), *cert. denied,* 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996); *Adams v. Rice,* 40 F.3d 72, 74 (4th Cir.1994), *cert. denied,* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995). Here, Turner's retaliation claims are ill-defined, as he complains, *inter alia,*

of "retaliatory disciplinary sanctions," using his documents "solely for retaliatory purposes," and confiscating his typewriter "in retaliation for Petitioner's legal actions and filings, and for his typing of the letter of Unity and the Petitions." The Fifth Circuit has observed:

> 'The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.'

*Woods*, 60 F.3d at 1166 (quoting *Adams*, 40 F.3d at 74). In *Woods*, the Fifth Circuit addressed the issue of retaliatory disciplinary actions in some detail:

> To assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them, trial courts must carefully scrutinize these claims. To state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident—such as the filing of disciplinary reports as in the case at bar—would not have occurred. This places a significant burden on the inmate. Mere conclusionary allegations of retaliation will not withstand a summary judgment challenge. The inmate must produce direct evidence of motivation or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred." Although we decline to hold as a matter of law that a legitimate prison disciplinary report is an absolute bar to a retaliation claim, the existence of same, properly viewed, is probative and potent summary judgment evidence, as would be evidence of the number, nature, and disposition of prior retaliation complaints by the inmate.

60 F.3d at 1166 (footnotes and citations omitted).

 As the Fourth Circuit has commented, "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Adams*, 40 F.3d at 74. Thus, "[a]n inmate claiming retaliation must ' "allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights." ' " *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quoting *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir.1990)). In addition, to prevail on a retaliation claim, the inmate " 'must prove that "but for" the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place.' " *Id.* (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)); *accord Woods*, 60 F.3d at 1166; *see Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993), *cert. denied*, 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994). In this situation, Turner has not shown that he engaged in any constitutionally protected activity. A prisoner has no constitutional right to organize a prison work shutdown or to circulate a petition facilitating such an action. *See Graham v. Henderson*, 89 F.3d 75, 80 & n. 1 (2d Cir.1996). If he had engaged in such activity, however, Turner has not shown that but for the constitutionally protected activity, he would not have been disciplined for preparing and circulating the work stoppage materials. Hence, Turner's allegations of retaliation are insufficient to overcome the findings of the disciplinary hearing officers.

 It is not the duty of this court to act as the hearing officer and re-determine the nature of Turner's offenses and punishment. *See Hill*, 472 U.S. at 455, 105 S.Ct. 2768; *Sweeney*, 113 F.3d at 720; *Reeves*, 19 F.3d at 1062; *Gibbs*, 779 F.2d at 1044. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *See Bell*, 441 U.S. at 547, 99 S.Ct.

1861. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Deference is appropriate here. Therefore, the decisions of the disciplinary hearing officers must stand.

■ Moreover, to the extent Turner is complaining about his fifteen-day cell restriction, fifteen-day loss of commissary privileges, and change in custody classification which negatively impacted his ability to accrue future good conduct time credit, he has failed to demonstrate an actionable constitutional deprivation. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996). In *Luken,* the Fifth Circuit rejected the notion that the mere opportunity to earn good conduct time credit constitutes a constitutionally cognizable liberty interest sufficient to trigger the protection of the Due Process Clause. *See* 71 F.3d at 193 (citing *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293). Luken challenged his confinement in administrative segregation, a custody status which prevented him from accruing additional good conduct time credit. *See id.* The Fifth Circuit acknowledged that the loss of the opportunity to earn good time credits, which might lead to earlier parole, was a collateral consequence of Luken's custodial status, but found that "such speculative, collateral consequences of prison administrative decisions do not create constitutionally protected liberty interests." *Id.* (citing *Meachum v. Fano,* 427 U.S. 215, 229 n. 8, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)). As the *Luken* court pointed out, "Any of a host of administrative or disciplinary decisions made by prison authorities might

somehow affect the timing of a prisoner's release, but such effects have never been held to confer a constitutionally protected liberty interest upon a prisoner such that the prison authorities must comply with the Constitutional requirements of due process." *Id.* at 193–94.

In *Sandin,* the Supreme Court rejected a similar due process challenge to disciplinary segregation, holding that the petitioner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." 515 U.S. at 486, 115 S.Ct. 2293. The Supreme Court explained:

States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship· on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 483–84, 115 S.Ct. 2293 (internal citations omitted). Although prisoners do not shed all constitutional rights at the prison gate, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and .rights, a retraction justified by the considerations underlying our penal system.' " *Id.* at 485, 115 S.Ct. 2293 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)); *see Wolff,* 418 U.S. at 555, 94 S.Ct. 2963. "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *See Sandin,* 515 U.S. at 485, 115 S.Ct. 2293. The Supreme Court, therefore, determined, "This case, though concededly punitive, does not present a dramatic departure from the basic conditions of Conner's indeterminate sentence." *Id.* The

Court concluded that the possibility that Conner's confinement in disciplinary segregation would affect the date he was ultimately released from prison "is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.; see Luken,* 71 F.3d at 193.

██ Similarly, when a reassignment from administrative segregation would make a prisoner eligible for parole but would not automatically shorten his sentence or lead to his immediate release, no liberty interest is implicated. *See Carson v. Johnson,* 112 F.3d 818, 820–21 (5th Cir. 1997). The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner. *See Sandin,* 515 U.S. at 487, 115 S.Ct. 2293 (citing *Meachum,* 427 U.S. at 224, 96 S.Ct. 2532); *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). Accordingly, depriving a prisoner of commissary privileges and restricting him to his cell for a period of time as punishment for a disciplinary offense are "merely changes in the conditions of his confinement and do not implicate due process concerns." *Madison v. Parker,* 104 F.3d 765, 768 (5th Cir.1997).

██ It has long been recognized that a prisoner has no inherent constitutional right to any particular security classification or custody level. *See Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Moody,* 429 U.S. at 88 n. 9, 97 S.Ct. 274; *Wilson v. Budney,* 976 F.2d 957, 958 (5th Cir.1992); *Moody v. Baker,* 857 F.2d 256, 257–58 (5th Cir.), *cert. denied,* 488 U.S. 985, 109 S.Ct. 540, 102 L.Ed.2d 570 (1988); *see also Sledge v. Pratt,* 106 F.3d 401, 1996 WL 765326, at *1 (6th Cir. Dec.13, 1996); *Brown v. Champion,* 61 F.3d 915, 1995 WL 433221, at *1 (10th Cir. July 24, 1995); *Blocker v. Hall,* 29 F.3d 630, 1994 WL 386311, at *2 (9th Cir. July 25, 1994); *Hopewell v. Berry,* 889 F.2d 1087, 1989 WL 137177, at *1 (6th Cir. Nov.15, 1989); *Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980). The Due Process Clause creates no right to a given custody status. *See Blocker,* 1994 WL 386311, at *2; *Jones v. Hodge,* 662 F.Supp. 254, 255 (E.D.N.C.1987). "An inmate has neither a protectable property nor liberty interest in his custody classification." *Baker,* 857 F.2d at 257–58; *accord Wilson,* 976 F.2d at 958. As long as the conditions or degree of confinement fall within the sentence imposed and do not otherwise violate the Constitution, the Due Process Clause does not bring the prisoner's custody status within the purview of judicial scrutiny. *See Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Jones,* 662 F.Supp. at 255. Stated simply, "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Sandin,* 515 U.S. at 480, 115 S.Ct. 2293 (quoting *Hewitt,* 459 U.S. at 468, 103 S.Ct. 864).

The Supreme Court in *Sandin* employed a new methodology for determining whether prison regulations regarding the confinement of an inmate create a liberty interest. *See Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir. 1995); *Orellana v. Kyle,* 65 F.3d 29, 31 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996). The Court focused on the discipline imposed and found an interest protectable by the Due Process Clause to exist only when prison discipline "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293; *see Bulger,* 65 F.3d at 50; *Orellana,* 65 F.3d at 31. In this instance, Turner did not suffer an atypical or significant hardship in the context of prison life merely by being reclassified, restricted to his cell for fifteen days, and losing his commissary privileges for fifteen days. Indeed, the punitive aspects of disciplinary segregation and administrative segregation, as addressed in *Sandin* and *Luken,* are far greater than those implicated by these penalties imposed on Turner. *See Sandin,*

515 U.S. at 485, 115 S.Ct. 2293; *Luken,* 71 F.3d at 193. Here, because Turner had no entitlement to a particular security classification, to commissary privileges, or to be free from cell restriction, to the extent his claims challenge those disciplinary sanctions, they implicate no protected liberty interests cognizable on federal habeas review. Accordingly, Turner's due process challenge to the prison disciplinary hearings must fail.

### 2. *Double Jeopardy Claim*

The Double Jeopardy Clause, contained in the Fifth Amendment to the Constitution, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This clause assures three basic protections—it protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *See United States v. Ursery,* 518 U.S. 267, 273, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *Witte v. United States,* 515 U.S. 389, 395–96, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); *Department of Revenue v. Kurth Ranch,* 511 U.S. 767, 769 n. 1, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); *United States v. Dixon,* 509 U.S. 688, 695–97, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *United States v. Cluck,* 87 F.3d 138, 140 (5th Cir.1996); *United States v. Gonzalez,* 76 F.3d 1339, 1343 (5th Cir.1996).

■ The principles of double jeopardy apply in criminal prosecutions and to the "rare" case in non-criminal proceedings where the penalties imposed serve a punitive rather than a remedial function. *See Halper,* 490 U.S. at 448–49, 109 S.Ct. 1892. In *Hudson v. United States,* the Supreme Court largely disavowed the *Halper* method of analysis in finding that administratively imposed monetary penalties and occupational disbarment did not bar the criminal prosecution of bank officials on charges arising from the same lending transactions because the prior administrative proceedings were civil, not criminal, in nature. *See* 522 U.S. 93, 118 S.Ct. 488, 491, 139 L.Ed.2d 450 (1997). The *Hudson* court noted that the "[Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense" occurring in successive proceedings. *Id.* at 493–94, 118 S.Ct. 488; *accord Ursery,* 518 U.S. at 273, 116 S.Ct. 2135; *Witte,* 515 U.S. at 395–96, 115 S.Ct. 2199; *United States v. Sanchez–Escareno,* 950 F.2d 193, 197 (5th Cir.1991), *cert. denied,* 506 U.S. 841, 113 S.Ct. 123, 121 L.Ed.2d 78 (1992); *Emory v. Texas State Bd. of Med. Examiners,* 748 F.2d 1023, 1026 (5th Cir.1984).

■ It is well settled that prison disciplinary proceedings do not constitute criminal prosecutions. *See Wolff,* 418 U.S. at 556, 94 S.Ct. 2963. Hence, they do not implicate the Double Jeopardy Clause, as its applicability is limited to proceedings that are " 'essentially criminal' " in nature. *Lucero v. Gunter,* 17 F.3d 1347, 1351 (10th Cir.1994) (quoting *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975)). Prison disciplinary proceedings and criminal prosecutions have differing goals. "The prison disciplinary process determines whether the defendant has violated the conditions of his incarceration and is designed to maintain institutional security and order." *Garrity v. Fiedler,* 41 F.3d 1150, 1152 (7th Cir.1994), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1420, 131 L.Ed.2d 303 (1995); *see United States v. Hernandez–Fundora,* 58 F.3d 802, 806 (2d Cir.), *cert. denied,* 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995); *United States v. Newby,* 11 F.3d 1143, 1144 (3d Cir.1993), *cert. denied,* 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994). In contrast, "[a] criminal prosecution is designed to punish the defendant for a violation of the criminal laws." *Garrity,* 41 F.3d at 1152; *accord Newby,* 11 F.3d at 1145. While prison disciplinary sanctions may have punitive aspects, they are primarily remedial in nature. *See United States v.*

*Brown,* 59 F.3d 102, 105 (9th Cir.1995); *Hernandez–Fundora,* 58 F.3d at 806. "Punitive interests and remedial interests ... are nowhere so tightly intertwined as in the prison setting, where the government's remedial interest is to maintain order and to prevent violent altercations among a population of criminals." *Id.*

■ Because the two proceedings serve different ends, the finding that a prisoner has violated institutional rules and no longer merits trustee status or good conduct time credits does not foreclose the criminal justice system from punishing him for the same conduct. *See Garrity,* 41 F.3d at 1153 (citing *United States v. Hanahan,* 798 F.2d 187, 189–90 (7th Cir.1986)). "Accordingly, the mere fact that a sanction imposed by prison officials has a punitive component does not mean that the sanction constitutes 'punishment' for double jeopardy purposes." *Hernandez–Fundora,* 58 F.3d at 806. "Prison administrators must have the ability to discipline a prisoner for violating institutional regulations, and the State must have the ability to prosecute the prisoner for the same conduct at a later date." *Garrity,* 41 F.3d at 1153. Consequently, it has long been recognized that the Double Jeopardy Clause does not prohibit criminal prosecution as well as administrative discipline of a prisoner for the same act. *See United States v. Mayes,* 158 F.3d 1215, 1220 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1130, 143 L.Ed.2d 123 (1999); *United States v. Galan,* 82 F.3d 639, 640 (5th Cir.), *cert. denied,* 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *Meeks v. McBride,* 81 F.3d 717, 722 (7th Cir.1996); *Hernandez–Fundora,* 58 F.3d at 806; *Garrity,* 41 F.3d at 1152; *Newby,* 11 F.3d at 1144–45; *United States v. Bryant,* 563 F.2d 1227, 1230 (5th Cir.1977), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1616, 56 L.Ed.2d 65 (1978); *Gilchrist v. United States,* 427 F.2d 1132, 1132 (5th Cir.1970); *United States v. Cordova,* 414 F.2d 277, 277–78 (5th Cir.1969); *McKinney v. State,* 491 S.W.2d 404, 407–08 (Tex.Crim.App.1973); *Mott v. State,* 846 S.W.2d 398, 399 (Tex.App.—Houston [14th Dist.] 1992).

■ Similarly, because a prison disciplinary hearing is not a criminal prosecution, "the Double Jeopardy Clause does not apply to prohibit the successive prison disciplinary proceedings at issue in this case." *Meeks,* 81 F.3d at 722. Prison discipline does not constitute prosecution or punishment for double jeopardy purposes, even when the disciplinary sanction delays the inmate's release from prison by depriving him of good time credits. *See Morales v. Newkirk,* 85 F.3d 631, 1996 WL 253852, at *1 (7th Cir.1996) (citing *Meeks,* 81 F.3d at 722). Thus, the Double Jeopardy Clause does not prohibit a federal prisoner from being charged and penalized in successive disciplinary proceedings for refusing to obey repeated orders to enter the general prison population. *See Caudle v. Geouge,* No. 89–3482–R, 1992 WL 436349, at *3 (D.Kan. Sept.8, 1992), *aff'd,* 986 F.2d 1426 (10th Cir.1993). In *Caudle,* the extent of punishment imposed on the inmate—disciplinary segregation and forfeiture of good time credits—at separate disciplinary hearings for repeated instances of the same misconduct was also determined not to violate the prohibition against double jeopardy. *See id.* In addition, the court observed:

> Further, even if this court were to find jeopardy attaches in a prison disciplinary proceeding, it would not entitle plaintiff to relief. Plaintiff refused several separate orders to enter general population and the similarity of the charges against him does not entitle him to relief on double jeopardy grounds.

*Id.* Hence, a prisoner charged with "duplicative offenses in prison disciplinary reports" cannot invoke the Double Jeopardy Clause because "this protection does not attach to administrative proceedings such as the institutional disciplinary proceedings at issue in this case." *Fowler v. Scott,* No. 90–3168–S, 1990 WL 94301, at *1 (D.Kan. June 8, 1990). Moreover, because

the Double Jeopardy Clause applies only to criminal or quasi-criminal proceedings, the imposition of multiple punishments—disciplinary segregation, loss of privileges, and forfeiture of good time credit—for the same act of misconduct does not give rise to double jeopardy concerns. *See Langton v. Berman*, 667 F.2d 231, 234 (1st Cir. 1981); *Dayutis v. Powell*, No. Civ. C–93–257–B, 1994 WL 258785, at *6 (D.N.H. May 2, 1994).

"In considering what is necessary and proper to preserve institutional order and discipline, and to encourage good conduct," courts generally defer to prison authorities. *See Newby*, 11 F.3d at 1146. "Historically, we have deferred to the expertise of prison authorities regarding questions of prison administration and discipline." *Garrity*, 41 F.3d at 1153 (citing *Bell*, 441 U.S. at 547–48, 99 S.Ct. 1861). In this instance, keeping in mind the deference due prison officials, the disciplinary sanctions imposed by the hearing officers were not "so grossly unrelated to prison authorities' remedial goal as to constitute a 'punishment' within the meaning of the Double Jeopardy Clause." *Newby*, 11 F.3d at 1145; *see Ex parte Hernandez*, 953 S.W.2d 275, 278 (Tex.Crim.App.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1093, 140 L.Ed.2d 149 (1998). It must be remembered that "prison is a place where good order and discipline are paramount because of the concentration of convicted criminals." *Newby*, 11 F.3d at 1145. "[Turner's] loss of [2,190] days of good time credits may at first glance appear to be harsh; however, on examination it is necessary in order to bring home to him and others the importance of continued good behavior." *Id.* Indeed, Turner did not cease possessing and distributing various versions of the work stoppage documents until the disciplinary sanctions reached this level. As the Texas First Court of Appeals held in *Glinski v. State:*

> We hold appellant's loss of all of his good time credit, no matter the amount lost, is not so grossly unrelated to the goals of maintaining discipline and order, and ensuring safety, as to trigger the protection of double jeopardy under either the United States or the Texas Constitution.

986 S.W.2d 79, 81 (Tex.App.1999, n.w.h.). In this instance, the court will not depart from the uniformly established rule that a prison disciplinary hearing is not a prosecution for double jeopardy purposes and does not bar subsequent prison disciplinary hearings for the same or similar misconduct.

■ In any event, Turner was not subjected to repeated punishment for the same offense. Turner's penalties, handed out in three separate disciplinary proceedings, brought by three different charging officers, and conducted by three different hearing officers were based on three separate incidents occurring on three different dates. It is well recognized that the commission of separate criminal acts subjects the offender to punishment for each criminal act. See Miller v. Turner, 658 F.2d 348, 350–51 (5th Cir.1981). In addition, at least four different documents were at issue. The exhibits attached to Turner's disciplinary records include a typed document entitled, "NOTICE TO: WYNNE UNIT INMATE CLASS SUBJECT: TOTAL UNITY & LIST OF DEMANDS TO WYNNE ADMINISTRATION AND TDCJID," which advocates, "EVERYONE REFUSE TO TURN OUT FOR WORK CALL ON THE DAY THE ADMINISTRATION OFFERS TO ALLOW U.S. TO RE–ENTER SLAVERY CONDITIONS." Also included is a typed document entitled, "TO: WYNNE UNIT ADMINISTRATION AND TDCJID DIRECTIONAL PERSONNEL SUBJECT: DEMANDS FOR BETTER INSTITUTIONAL CONDITIONS," which states, "THE ONLY THING 'NEGOTIABLE' ABOUT THESE DEMANDS IS THAT ONCE THEY ARE AGREED TO WE WILL RETURN TO WORK FOR TDCJID." In addition, there is a handwritten "PETITION OF DEMAND" complaining of the

lack of inmate pay, demanding pay for inmate labor rather than good time credit, and declaring, "WE WILL TOLERATE NO FURTHER TINKERING WITH OR AMENDING OF GOOD–TIME POLICY IN DETRIMENTAL FASHION." Finally, the exhibits include a handwritten commentary entitled, "WE WILL TAKE OVER," which states, "ALL WE HAVE TO DO IS STICK TOGETHER AND WE CAN MAKE THEM GIVE U.S. WHATEVER WE WANT! SHOOT, WE CAN EVEN TAKE THIS PLACE OVER IF WE HOLD OUT ON 'EM!"

Even if the materials were identical, Turner's actions are analogous to counterfeiting and obscenity violations. Although Turner may have produced the materials all at one time, the fact that he possessed and distributed them to different inmates on different occasions is indicative of a separate offense in each instance. For example, if Turner had mailed three copies of obscene material to three separate recipients, he would be guilty of three separate offenses. *See United States v. Gallardo*, 915 F.2d 149, 151 (5th Cir.1990), *cert. denied*, 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991) (mailing four separate envelopes containing child pornography constitutes four separate offenses). Similarly, if Turner had passed three separate counterfeit bills produced from the same original bill to three individual store clerks, he could be convicted three times for the three separate acts, and there would no double jeopardy violation. *See id.* Likewise, "[e]ach separate use of the mail in furtherance of a scheme [to defraud] constitutes a separate crime." *United States v. Blankenship*, 746 F.2d 233, 236 (5th Cir.1984). Because "each use of the mails is a separate offense under the mail fraud statute ... consecutive sentences may be imposed properly, even if the mailings arose from a single concerted plan to defraud." *United States v. Shaid*, 730 F.2d 225, 230 (5th Cir.), *cert. denied*, 469 U.S. 844, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). Indeed, in light of the number of copies produced and distributed, Turner

theoretically could have been charged with at least 150 separate offenses. Thus, Turner's double jeopardy claim must be rejected.

### B. *Restoration of Good Time Credits*

#### 1. *Due Process Claim*

■ The Due Process Clause applies when governmental action deprives a person of life, liberty, or property. *See Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). When there is a claimed denial of due process, the court looks to the nature of the individual's claimed interest. *See id.* The United States Supreme Court has explained that " '[t]o determine whether due process requirements apply in the first place, we must look not to the "weight" but to the nature of the interest at stake.' " *Id.* (quoting *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Thus, to possess a protected right, " 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' " *Id.* (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701). When state action is at issue, "[t]he protections of the Due Process Clause are only invoked when State procedures which may produce erroneous or unreliable results imperil a protected liberty or property interest." *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)).

■ It is well established that "[t]he Constitution does not guarantee good time credit for satisfactory behavior while in prison." *Madison*, 104 F.3d at 768 (citing *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963); *accord Hamill v. Wright*, 870 F.2d 1032, 1036 (5th Cir.1989). Instead, the awarding of good conduct time is a matter

of state law, not a federal constitutional issue. *See Holtzinger v. Estelle,* 488 F.2d 517, 518 (5th Cir.1974). When a state creates a right to good time credit sufficient to give rise to a liberty interest, a prisoner is entitled to Fourteenth Amendment procedural due process in relation to the loss of such credit. *See Madison,* 104 F.3d at 768 (citing *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963); *accord Hamill,* 870 F.2d at 1036. Under Texas law, however, "good-time credit is not a vested right, but rather is a privilege which may be forfeited, either by violating the TDCJ's rules while in its custody, or by violating the guidelines of a conditional release program." *Ex parte Henderson,* 645 S.W.2d 469, 472 (Tex.Crim.App.1983) (citing *Ex parte Morris,* 626 S.W.2d 754, 757 (Tex.Crim.App. 1982); *Ex parte Boyd,* 152 Tex.Crim. 164, 212 S.W.2d 156, 158 (1948)); *see Ex parte Montgomery,* 894 S.W.2d 324, 328–29 (Tex. Crim.App.1995).

At the time Turner committed the underlying offenses, Texas law provided, as it does today, that "[g]ood conduct time credit applies only to eligibility for parole or mandatory supervision ... and shall not otherwise affect the inmate's term." TEX. REV.CIV.STAT.ANN. art. 6181–1, § 4 (West 1977); *see* TEX.GOV'T CODE ANN. § 498.003(a) (West 1998). Texas law further confirmed, as it does today, that "good conduct time is a privilege and not a right." TEX.REV.CIV.STAT.ANN. art. 6181–1, § 4 (West 1977); *see* TEX. GOV'T CODE ANN. § 498.003(a) (West 1998). The statute further provided:

> Consequently, if during the actual term of imprisonment in the department, an inmate commits an offense or violates a rule of the department, all or any part of his accrued good conduct time may be forfeited by the director. The director may, however, in his discretion, restore good conduct time forfeited under such circumstances subject to rules and policies to be promulgated by the department.

TEX.REV.CIV.STAT.ANN. art. 6181–1, § 4 (West 1977).

The Texas Legislature amended the statute in 1987, adding a provision that allowed the Texas Board of Criminal Justice ("the Board") to adjust its policy on restoration of good time credits in relation to prison overcrowding:

> At least annually, the Texas Board of Corrections shall review the department's rules and policies relating to restoration of good conduct time that has been forfeited and in awarding additional good conduct time retroactively to inmates who have been reclassified. The board shall consider in its review whether the inmate overcrowding in the department has decreased and whether it is necessary for purposes of decreasing the overcrowding to restore good conduct time or award additional good conduct time retroactively to inmates who have been reclassified. If the board determines that overcrowding has decreased and it is not necessary to restore good conduct time or award additional good conduct time, it shall direct the department to discontinue those practices.

TEX.REV.CIV.STAT.ANN. art. 6181–1, § 4 (West 1988); *see Hallmark,* 118 F.3d at 1075. Thus, if the Board determined that there was a decrease in overcrowding, it could direct prison officials to discontinue the restoration of good conduct time credits.

In 1993, the Board issued a "Notice to Inmate Population," dated November 12, 1993, which stated:

> Effective November 20, 1993, the Texas Department of Criminal Justice—Institutional Division will discontinue the restoration of good conduct time forfeited as a result of disciplinary violations. This change in policy applies to good conduct time that is currently forfeited or that is forfeited in the future due to disciplinary rule violations. This means that any lost good time that was not

restored as of November 20 will be permanently forfeited.

The policy was enforced as announced.

Thus, from 1977 until the Board issued the directive in 1993, the Director of the Texas Department of Criminal Justice possessed complete discretion to forfeit good time credits for prison rule violations and also had the discretion to restore previously forfeited, good conduct time credits to inmates who had lost the credits due to disciplinary infractions. *See Hallmark,* 118 F.3d at 1079. Effective September 1, 1995, the discretion to restore good conduct time credit forfeited for disciplinary violations was statutorily abolished:

> If, during the actual term of imprisonment of an inmate in the institutional division or in a transfer facility, the inmate commits an offense or violates a rule of the division, the department may forfeit all or any part of the inmate's accrued good conduct time. The department may not restore good conduct time forfeited under this subsection.

TEX.GOV'T CODE ANN. § 498.004(a) (West 1998).

▉ The lack of standards for the restoration of good time credit under prior law indicates a grant of unfettered discretion which dispels the notion of a liberty interest. *See Montgomery,* 894 S.W.2d at 328. Consequently, any interest in restoration that Turner may have possessed was merely speculative, as it was dependent on a number of factors, including his conduct in prison, the opinions of prison officials evaluating his behavior, the number of individuals in the prison population, the availability of prisons to house them, and the manner in which the director chose to exercise his discretion regarding the restoration of credits. *See id.* Thus, in *Montgomery,* the Texas Court of Criminal Appeals concluded that "[b]ecause the due process clause itself does not include a right to earn good time credits, there exists no absolute right to have lawfully forfeited credits restored." *Id.* In *Hallmark,* the Fifth Circuit agreed, stating, "[b]e-

cause the state statutes have, since at least 1977, vested complete discretion with the state correctional authorities on the issue of restoration of good time credits forfeited for disciplinary infractions, there is no protected liberty interest in the restoration of good time credits...." 118 F.3d at 1079–80 (citing *Greenholtz,* 442 U.S. at 11, 99 S.Ct. 2100; *Hamill,* 870 F.2d at 1036–37; *Montgomery,* 894 S.W.2d at 328–29); *see also Board of Pardons v. Allen,* 482 U.S. 369, 378 n. 10, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 466, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981); *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir. 1995). Therefore, the failure to restore Turner's previously forfeited, good conduct time credits violates neither Texas law nor the Due Process Clause of the United States Constitution.

### 2. *Ex Post Facto Claim*

▉ To establish an *ex post facto* violation, Turner must show that a new law either:

(1) punishes as a crime an act previously committed which was innocent when done;

(2) changes the punishment and inflicts greater punishment than the law attached to a criminal offense when committed; or

(3) deprives a person charged with a crime of any defense available at the time the act was committed.

*Collins v. Youngblood,* 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). The Supreme Court has explained:

> After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor ... on whether an amendment affects a prisoner's 'opportunity to take advantage of provisions for early release,' ... but on whether any such change alters the definition of criminal conduct or increases

the penalty by which a crime is punishable.

*California Dept. of Corrections v. Morales,* 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). In this situation, Turner must demonstrate that a change in the law increases or makes the punishment for his crime more burdensome. *See Hallmark,* 118 F.3d at 1077–78; *Creel v. Kyle,* 42 F.3d 955, 957 (5th Cir.), *cert. denied,* 514 U.S. 1070, 115 S.Ct. 1706, 131 L.Ed.2d 567 (1995). "In order to amount to an *ex post facto* violation, a change must be both retroactive and to a prisoner's detriment." *Hallmark,* 118 F.3d at 1077–78. " '[T]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.' " *Id.* at 1078 (quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. 960).

"A law need not impair a vested right to violate the ex post facto prohibition." *Allison,* 66 F.3d at 74 (citing *Weaver,* 450 U.S. at 29–30, 101 S.Ct. 960); *accord Orellana,* 65 F.3d at 32. " 'The presence or absence of an affirmative, enforceable right is not relevant.... Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and government restraint when the legislature increases the punishment beyond what was prescribed when the crime was consummated.' " *Allison,* 66 F.3d at 74 (quoting *Weaver,* 450 U.S. at 30, 101 S.Ct. 960); *accord Orellana,* 65 F.3d at 32.

Turner argues that because his offenses occurred prior to the effective date of the Board's 1993 policy, application of the new policy in his situation constitutes an *ex post facto* violation. Here, the central issue of the *ex post facto* inquiry is whether the 1993 directive effectively increased or made Turner's punishment more burdensome. *See Hallmark,* 118 F.3d at 1078 (citing *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997)). It must be determined if the change in policy disadvantaged Turner to a degree of *ex post facto* significance by producing a sufficient risk of increasing the measure of punishment attached to his underlying crimes. *See id* (citing *Morales,* 514 U.S. at 508–10, 115 S.Ct. 1597). Turner, however, cannot show that the 1993 directive increased his punishment or made it more burdensome, as he never possessed any constitutional or statutory entitlement to reinstatement of previously accrued good time credits forfeited as a result of a prison disciplinary proceeding. *See Montgomery,* 894 S.W.2d at 328 (citing *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963). Since at least 1977, the restoration of previously forfeited, good time credits has not been mandatory in Texas. *Id.*

In this situation, the Board's policy directive has not increased Turner's punishment for the offenses of burglary of a habitation or aggravated assault beyond what was prescribed when the crimes were committed. Turner still must serve the same fifty-year sentence and five-year sentence imposed by the trial courts and permitted by Texas law at the time of the offenses. Turner's prison sentences were never decreased by his previously accrued good time credit because, under Texas law, "[a] person's sentence is not reduced by good time credit." *Ex parte Hallmark,* 883 S.W.2d 672, 674 (Tex.Crim.App.1994); *accord Montgomery,* 894 S.W.2d at 328. While good time credits apply to eligibility for parole or mandatory supervision in Texas, they do not affect the actual length of the inmate's sentence. *See id.; Hallmark,* 883 S.W.2d at 674. "Once an inmate is paroled or released to mandatory supervision the period of parole is equal to the maximum term for which the person was sentenced less calendar time actually served on the sentence," without any reduction for previously accrued good time credits. *Id.*

Unlike *Weaver* and *Lynce,* this case does not involve a retroactive denial of an opportunity to reduce a prison sentence or the cancellation of good time credits al-

ready earned. *See Hallmark,* 118 F.3d at 1078. "The 1993 directive did not retract already accumulated good time credits" and prisoners "were not denied the opportunity to earn good time credits." *Id.* In fact, inmates retained the opportunity to earn just as many good time credits as they could on the day they committed their crimes. *See id.* "The only change enacted by the 1993 directive was that upon loss of good time credits as a result of disciplinary infractions, there was no longer a possibility of those good time credits being restored." *Id.*

"Although a 'speculative, attenuated risk of affecting a prisoner's actual term of confinement' may exist, that fact does not answer an *ex post facto* inquiry." *Id.* (quoting *Morales,* 514 U.S. at 508–09, 115 S.Ct. 1597). "The question of this constitutional transgression has long been 'a matter of degree.'" *Id.* (quoting *Morales,* 514 U.S. at 508–09, 115 S.Ct. 1597). In this instance, the risk of the Board's policy adversely affecting a prisoner's term of confinement is too attenuated to rise to a level of constitutional significance. As the Fifth Circuit explained in *Hallmark:*

> The appellants were denied only of the opportunity to have forfeited good time credits restored and only if (1) they committed a prison violation, (2) discretion was exercised to forfeit some of their good time credits because of the rule infraction, and (3) they would have, under the earlier discretionary scheme, had those good time credits restored. In other words, while the opportunity to earn early release was constricted to some degree, it was only if there was a disciplinary problem, a discretionary exercise of forfeiture was exercised, and the prisoner would have had the good time credits restored under the previous discretionary restoration scheme. Such is too attenuated and speculative to constitute an *ex post facto* violation.

*Id.* at 1078–79 (citing *Hamm v. Latessa,* 72 F.3d 947, 958 (1st Cir.1995), *cert. denied,* 519 U.S. 856, 117 S.Ct. 154, 136 L.Ed.2d 99 (1996)). The fact that there was always a possibility that Turner would lose good time credits as a result of a disciplinary violation and never have them restored indicates that the 1993 Board directive did not increase his punishment. As with *Sandin, Carson,* and *Bulger,* Turner's situation does not "present a case where the State's action will inevitably affect the duration of his sentence." *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293; *see Carson,* 112 F.3d at 821; *Bulger,* 65 F.3d at 50. In short, "[t]he 1993 directive did not substantially alter the consequences attached to a crime already completed, and thus it did not change the quantum of punishment such that it is unconstitutional." *See Hallmark,* 118 F.3d at 1079.

■ Furthermore, it is well established that the *Ex Post Facto* Clause applies only to changes in the law through legislative acts, not to changes in policy or to new interpretations of existing laws. *See Collins,* 497 U.S. at 41, 110 S.Ct. 2715; *Cortinas v. United States Parole Comm'n,* 938 F.2d 43, 46 (5th Cir.1991); *Gabel v. McCotter,* 803 F.2d 814, 815 (5th Cir.1986), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987); *United States v. Olivares–Martinez,* 767 F.2d 1135, 1139 (5th Cir.1985). As the Supreme Court has stated, "[a]lthough the Latin phrase 'ex post facto' literally encompasses any law passed 'after the fact,' it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them." *Collins,* 497 U.S. at 41, 110 S.Ct. 2715. The phrase "*ex post facto* law" was a term of art with an established meaning at the time the Constitution was written. *See id.* Hence, a change in the Board's discretionary policy concerning the restoration of good conduct time credits does not constitute a change in a legislative enactment, but merely a determination by the Board to exercise its discretion differently. A majority of the federal courts of appeal, including the Fifth Circuit, have found that

a change in the manner in which statutorily bestowed discretion is exercised does not raise *ex post facto* concerns. *See Portley v. Grossman*, 444 U.S. 1311, 1312–13, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980); *Bailey v. Gardebring*, 940 F.2d 1150, 1156 (8th Cir.1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); *Sheary v. United States Parole Comm'n*, 822 F.2d 556, 558 (5th Cir.1987); *Wallace v. Christensen*, 802 F.2d 1539, 1553–54 (9th Cir.1986); *Inglese v. United States Parole Comm'n*, 768 F.2d 932, 936 (7th Cir.1985); *DiNapoli v. Northeast Regional Parole Comm'n*, 764 F.2d 143, 146–47 (2d Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985); *Dufresne v. Baer*, 744 F.2d 1543, 1550 (11th Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 49 (1985); *Warren v. United States Parole Comm'n*, 659 F.2d 183, 195–97 (D.C.Cir.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982). Thus, Turner cannot show that the 1993 Board directive regarding the restoration of good conduct time credits is an impermissible *ex post facto* law.

Moreover, an essential element of an *ex post facto* violation is an absence of forewarning. *See id.* As the Supreme Court has noted, "critical to relief under the *ex post facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond that what was perceived when the crime was consummated." *Weaver*, 450 U.S. at 30, 101 S.Ct. 960; *see Allison*, 66 F.3d at 74; *Orellana*, 65 F.3d at 32. Here, as the Fifth Circuit found in *Hallmark*, there was fair warning of the possibility of the permanent forfeiture of good time credits, as the director "has had the power since 1977 to decline to restore, at his discretion, good time credit forfeited for prison violations." *Hallmark*, 118 F.3d at 1079. Although Turner was explicitly advised of this possibility by the Board's 1993 directive, he did not heed the warning two years later in 1995 when he chose to publish inflammatory and disruptive calls for

unity of prisoners and demands to prison officials. As a consequence, Turner's *ex post facto* claim is without basis.

### C. *Review of Custody Classification*

Turner also complains that he must wait one year, rather than ninety days as required by prior prison policy, before he can be reclassified to a more favorable time-earning classification. To obtain federal habeas corpus relief, a prisoner must establish that he has been deprived of a constitutional right. "A state prisoner seeking federal court review of his conviction pursuant to 28 U.S.C. § 2254 must assert a violation of a federal constitutional right." *Lawrence v. Lensing*, 42 F.3d 255, 258 (5th Cir.1994); *accord Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 2364, 141 L.Ed.2d 731 (1998); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir.1996), *cert. denied*, 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir.1993); *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir.1993). " ' "[N]either habeas nor civil rights relief can be had absent the allegation by a plaintiff that he or she has been deprived of some right secured to him or her by the United States Constitution or the laws of the United States." ' " *Orellana*, 65 F.3d at 31 (quoting *Hilliard v. Board of Pardons & Paroles*, 759 F.2d 1190, 1192 (5th Cir. 1985) (quoting *Irving v. Thigpen*, 732 F.2d 1215, 1216 (5th Cir.1984))). The federal habeas corpus statute provides:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). Thus, when a federal court reviews a petition for a writ of habeas corpus from a state prisoner, its inquiry is restricted to "whether the peti-

tioner is 'in custody in violation of the Constitution or laws or treaties of the United States.' " *Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (quoting 28 U.S.C. § 2254(a)). Hence, a federal writ of habeas corpus will not be granted to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir.), *cert. denied*, 510 U.S. 1025, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993); *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir.1988).

■ Turner's complaint concerning the lengthening of the time period between reviews of his custody classification, which delayed his ability to be reclassified to a more favorable time-earning class, does not raise a constitutional violation. As noted above, Turner has no constitutional right to any particular custody classification. *See Hewitt*, 459 U.S. at 468, 103 S.Ct. 864; *Moody*, 429 U.S. at 88 n. 9, 97 S.Ct. 274; *Wilson*, 976 F.2d at 958 (5th Cir. 1992); *Baker*, 857 F.2d at 257–58. Moreover, he has not suffered an atypical and significant hardship in relation to the ordinary incidents of prison life merely by being required to wait a longer period of time before being considered for reclassification. *See Sandin*, 515 U.S. at 484, 115 S.Ct. 2293; *see Bulger*, 65 F.3d at 50; *Orellana*, 65 F.3d at 31. The mere opportunity to earn good conduct time credit does not constitute a constitutionally cognizable liberty interest. *See Luken*, 71 F.3d at 193. In addition, because no statutory change is involved, a revision in prison policy that merely lengthens the period of time between classification reviews cannot violate the *Ex Post Facto* Clause. *See Orellana*, 65 F.3d at 32; *Creel*, 42 F.3d at 957; *see also Allison*, 66 F.3d at 74.

Thus, Turner's complaint that he must wait a longer period of time before he can be reclassified does not raise a constitutional claim under either the Due Process Clause or the *Ex Post Facto* Clause. As a consequence, Turner's challenge to the extension of time between reviews of his custody classification provides no basis for federal habeas corpus relief.

#### D. *Confiscation of Property*

■ Finally, Turner complains that his typewriter and other personal property were confiscated, lost, or destroyed by prison officials in violation of prison policy. "A state's failure to follow its own procedural regulations does not constitute a violation of due process, however, if 'constitutional minima [have] nevertheless ... been met.' " *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir.1994) (quoting *Brown v. Texas A & M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986)); *see Jackson*, 864 F.2d at 1251. Deprivations of property caused by the misconduct of state officials do not infringe constitutional due process if adequate state post-deprivation remedies exist. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Murphy*, 26 F.3d at 543; *Marshall v. Norwood*, 741 F.2d 761, 763 (5th Cir.1984); *see also Collins v. King*, 743 F.2d 248, 253 (5th Cir. 1984). "In Texas, as in many states, the tort of conversion fulfills this requirement." *Murphy*, 26 F.3d at 543.

■ Moreover, because a favorable determination on his property claim would not automatically entitle Turner to accelerated release from prison, a petition for a writ of habeas corpus is an improper method to raise this claim. *See Carson*, 112 F.3d at 820–21; *Orellana*, 65 F.3d at 31. Federal courts have jurisdiction to entertain a writ of habeas in behalf of a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Thus, a habeas petition is the proper vehicle to seek release from custody, not to challenge the conditions of

confinement or prison procedures. *See Carson,* 112 F.3d at 820; *see Pugh v. Parish of St. Tammany,* 875 F.2d 436, 439 (5th Cir.1989). A writ of habeas corpus is the appropriate federal remedy for a state prisoner challenging the fact or duration of his confinement. *See Preiser v. Rodriguez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Spina v. Aaron,* 821 F.2d 1126, 1127–28 (5th Cir.1987). Generally, suits brought pursuant to 42 U.S.C. § 1983 are the proper vehicle to attack unconstitutional conditions of confinement and prison procedures. *See Carson,* 112 F.3d at 820; *Cook v. Texas Dept. of Criminal Justice Transitional Planning Dept.,* 37 F.3d 166, 168 (5th Cir.1994). Nevertheless, in the absence of a viable constitutional claim, Turner's complaint concerning the confiscation of his property is not actionable on federal habeas review or under § 1983. *See Murphy,* 26 F.3d at 543; *Marshall,* 741 F.2d at 763.

## V. *Conclusion*

In summary, federal habeas corpus relief is not warranted under any theory advanced by Turner. The state courts reached the same result, as reflected by the Texas Court of Criminal Appeals' denial of Turner's state application for a writ of habeas corpus without written order. A denial by the Texas Court of Criminal Appeals of a state habeas application without written order is an adjudication on the merits where, as here, a procedural ground for denying the application does not appear in the state habeas record. *See Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir.1998), *petition for cert. filed,* (U.S. Jan. 20, 1999) (No. 98–7812); *Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir.1997).

The federal habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, precludes federal courts from granting habeas corpus relief to state prisoners with respect to any claim that was adjudicated on the merits in a state court proceeding, unless one of two express requirements is satisfied. The statute provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This court, therefore, is bound by the state courts' decisions, as they are neither contrary to nor involve an unreasonable application of clearly established federal law as determined by the Supreme Court, nor are they based on an unreasonable determination of the facts in light of the evidence presented. Thus, the state courts' denial of habeas corpus relief to Turner must stand.

Accordingly, Johnson's Motion for Summary Judgment is granted. Turner has failed to present a claim that would entitle him to relief. There are no material facts in dispute, and Johnson is entitled to judgment as a matter of law.